May it please the Court, Counsel, my name is Katherine Hart with the Office of the State Appellate Defender in Springfield and I represent Donald Watkins. The case against Donald Watkins was cursory at best. There was no physical evidence from the crime scene. Let me say this, it's not a mic, it's a recording device. You're going to have to keep your voice up in order to compete with the noise in the courtroom. Okay, Your Honor. Thank you. There was no physical evidence at the scene that tied Donald Watkins to the scene. There was no weapon recovered, no clothing that was described was recovered, no fingerprints or footprints matched Donald, and no blood was found on any part of Donald from the murder of Alfred Curry. And that scene was a very bloody and messy scene. There was no link or motive provided for why Donald would have committed the crime. How soon thereafter was he arrested following the incident? I believe he was arrested approximately five hours following the gunshots. And the search of the home pursuant first to his arrest and then to the search warrant? How quickly did that happen? It followed immediately after. They discovered where he was living, they went to the house, they removed him from the house and they searched the scene. That all occurred probably within seven or eight hours. There were three witnesses that left the murder scene alive. The first witness was Maurice Thorn, and his description was that there were two men who broke into the apartment who killed Alfred Curry. He did not identify Donald Watkins as either of those men. The second witness was Verlesia Willis, an admitted drug addict. She did identify Donald Watkins. And the third witness is the reason we are here today. That third witness was Melissa W. She was seven years old at the time of Alfred Curry's murder. In the 72 hours following the crime, she was twice asked to identify Donald Watkins from a photo array and a lineup. And she never identified him as the person who killed Alfred Curry. Three years later, Donald Watkins was brought to trial. The state's attorney emphasized the fact that Melissa had a drug problem, but do you denigrate at all Melissa's testimony because of her age? She was only seven years old. Do I denigrate Melissa's testimony? Is it less credible due to her youth? I don't believe it was necessarily less credible. She was seven at the time of the crime. She was ten at the time of the trial. And it's the three year gap more than anything that is the necessary fact. Also, she was seven. She wasn't three or four. She was old enough to see what was going on around her. Let me explore that. You say the gap between her age at the time of the trial and ten. What specifically did you mean by that gap? At the time of the crime, she was asked to identify Donald Watkins from a photographic array and from a lineup. And she did not pick him out from either the lineup or the array. And what are we to make of that, if anything? That she didn't see the there's no intervening attempt at identification. Three years later, they go to trial. And she was on the witness list? She was on the witness list, but the discovery tendered to the defense was that she never identified Donald Watkins. They had no reason to think that she was an ID witness. When the trial began, there was only one witness, as far as the defense was concerned, that would identify Donald Watkins as the person who killed Alfred Curry. What are we to make of the state's opening argument that it did not know what Melissa was going to testify at trial and that the state, just like the jury, would first hear it when she takes the witness stand? I'm glad you brought that up, Your Honor. I think that that shows clearly that the state intended to ask Melissa to identify Donald Watkins at trial. Do you think there was some mention that the identification at trial was spontaneous? Was the notion that there might be an identification consistent with I don't believe that there is any notion of spontaneity available from the record. It's clear that the state was intending to ask Melissa W. to identify the person who killed I believe that the record shows that the ASA admitted that he was planning on asking her to ask Donald Watkins, but he just wasn't sure what she was going to say. Now, I think that the preparation of the witness prior to trial and the interaction that the defense attorney walked in on is suspect, but without impugning the state's attorney, regardless of what may have been said to Melissa, we know from the record that prior to trial, Melissa knew that Spanky was sitting at defense table next to defense counsel. And she met defense counsel and shook hands with her and said, you're Spanky's attorney, you'll be sitting next to him. Let me question that assertion that given the manner in which I question, ask the question, and I might be suggesting that the state's attorney was lying. I certainly am not. And I'm certainly, I certainly accept that the state's attorney never asked the young girl the question of whether or not she could identify the individual, and that question would be first asked when she was at the stand, when she took the stand. The question is whether there was a likelihood that such a question would be asked, and that seems absolutely certain. And then the question becomes whether it's a likelihood that she would answer yes. And there's really only two answers to that question. One is that the state's attorney is lying by the state's attorney, because he may never, and I accept the fact that he never asked her directly, do you, are you able to identify Spanky as the individual that was in the bedroom that night, and absent asking her that question during pre-trial preparations, there's no way he could possibly, his representation, excuse me, to the court cannot be anything other than accurate. Do you accept that? The, the converse of the, the, we can certainly say that the trial judge found that it was, he accepted the representation by the assistant state's attorney that he did not knowingly ask that question with the, with the knowledge that the answer was going to be, it was Spanky, as accurate. That's correct. I don't believe that he knew she would say yes, but he knew that he would ask for that question. And how, how was that question asked? Specifically, he said, I believe he said, when you woke up, who did you see in the room? The question, who did you see in the room, does that sort of lend itself to anything other than an identification? Does that suggest that an identification should be made or would be made? I think that there's no question that he was asking her to identify. So the question wasn't asked, did you see anyone in the room? The question was asked, who did you see in the room? And if you take a look at the dictionary, who is which person or persons, what person or persons? Anywhere you want to go with that? Yes, I, I agree with Your Honor. He was clearly asking her to identify Donald Watkins. And so that is the very crux of the issue, which is that the state did not disclose to the defense this potentially inculpatory identification, which the defense had the right to know of. And if they had known that this was going to happen at trial, they would have filed a motion in limiting or a motion to suppress identification. Did you just finish saying that you thought that the state's attorney was, was not holding back information, but that, that they were, they didn't know what the young, Melissa was going to respond at the time of trial in response to Justice Garcia's question? Your Honor, what I said was I don't believe that the state's attorney necessarily asked her specifically, will you identify Donald Watkins as the defendant? I think that there's no question he was intending to ask her and that he had a strong, that he was intending to ask her to identify somebody. He, he said in his opening, I don't know what she's going to say. And And you, you, you believe that he, that he did not know what she was going to say? Well, I think he believed that she would say that's Donald, it was Donald Watkins, it was Spain. You're saying that you, you believe that he did not know what she was going to say. And if you believe that, then what reason would he have for declaring her as an ID witness previously? He did not, he did not know, absolutely. He did not, as what Justice Garcia said was, I believe he did not absolutely ask her before trial, are you saying that he had a duty not knowing what she was going to say to inform you or, or, or defense counsel that he was going to ask that question? I believe he did have a duty because he, he felt that she would make an inculpatory identification. Let's, let's, let's examine Supreme Court Rules 412 in terms of the language, in terms of what obligation the state has. The state has an obligation to disclose information in its possession or, do you know the rest of the, of the obligation or the, the, the triggering information? I'm sorry, Your Honor. Possession or control. And, and to the extent that control means that information will be elicited by virtue of the question asked of the witness on the stand, even though that question may not have been asked during pretrial preparations for whatever reason, it's certainly within the state's control, by virtue of the question asked, that an identification would ensue. Isn't that an accurate statement? Doesn't that fall within the extent that 412 requires the state to disclose the information in its possession or control? That is exactly what we're arguing, Your Honor. So how could it be in his possession or control if he did not know what she was going to say? I mean, I could understand it if he had previously examined the witness, but this witness previously had not indicated that she was able to identify the defendant either through an, an array or through photos. The fact that he chose... And so, you know, how could you, how could you say that the state was in control of information or that they were in possession of information when there was no prior indication? And you yourself have stood here today and said that the state's attorney did not know what she was going to say. Your Honor, what I said was the state's attorney claimed that he did not know... No, you didn't say that. ...that there was nothing in the record to indicate that he knew definitively. The fact that he chose as a strategy not to ask her specifically before trial, the question that he then asked her at trial, doesn't mean that he, he didn't know what was going to happen. But what was an indication that he, that he did know what was going to happen? The entire interaction... Where, where was there any indication of that? The entire interaction that he had with her in the courtroom prior to trial where he was prepping the witness and the defense attorney came in and the child said, are you Spanky's attorney? Are you sitting over there? Is... In fact, didn't he represent to the court that he was, you know, as surprised as anyone? I mean... I think that the surprise is a little disingenuous considering that he was going to be asking her the question. The question is telling us that you didn't, you like Justice Garcia, didn't think that the state's attorney was prevaricating. There's a difference between stating, I did not know for sure what she would say. His opening statement where he said, I don't know what she will say. I know what she said before, but in this setting, I don't know what she will say. We'll all find out together. And what he said before was that she was unable to identify the defendant. It was a clear indication that he was hoping that she would identify Donald Watkins and the entire interaction in the courtroom prior to trial is further a sign of that. Regardless of the state's attorney's... But is that sufficient to meet the burden of 412? Regardless of the state's attorney's statements... I believe that it is in this situation. I believe that he had a duty to disclose to the defense, especially in this situation. Because it was an inherently unreliable identification. And they would have filed a motion to suppress the identification. There would have been a full hearing where they would have gone through all of the factors. And the factors just don't hold up. They don't. And she... says, Spanky's sitting over there. And then, so we know that she knows where he's sitting. This is a little girl who was the victim of a terrible crime and understandably wants somebody to pay. And I don't blame her in the least for pointing to Donald Watkins. But that doesn't mean that she remembered him as the person who killed Alfred Curry. And that's ultimately the question. Was this a reliable identification? And it wasn't. And if the state had upheld their burden and disclosed to the defense what they were going to be doing, there would have been a hearing. And at the hearing, they would have found the identification... Then why was the identification unreliable? There were many reasons that the identification was unreliable. There were three years from the time that the crime occurred at trial. That's a huge length of time where she never identified Donald Watkins as the person who killed Alfred Curry. She was woken up from a deep sleep. She told the police right after the crime that it was too dark in the room. She could not see the perpetrator's face. Her description of the defendant is simply of clothing to the police at that time. She doesn't identify him in the photographic array or the lineup. She said during her testimony that she thought she knew him because he might have come by a week before. But that testimony was never fleshed out. She didn't live with Felicia Willis. She lived with her grandmother. And she didn't know his nickname. She heard her mother say what she thought was Spanky. It was actually Speedy. His nickname was actually Speedy. And all of those things show that the ID should not have been allowed. That it was unreliable. The state disputes that there was a discovery violation, that the biggest factors should be applied to determine if the ID was sufficiently reliable, and finally asserts that the ID was reliable. This case admittedly implicates the intersection of several areas of law, but the facts are that the state had continuing duty under Supreme Court Rule 412 to tender discovery to the defendant. The state tendered discovery to Donald Watkins that indicated that Felicia Willis was the only witness who would ID Donald Watkins. When the state determined that they would ask Melissa, a witness who had previously not identified Donald Watkins, to identify the person who killed Alfred Curry, they had an obligation to inform the defendant because they were adding the possibility of an inculpatory ID. Or as the appellate court stated in People v. Hendricks, the duty of the state to disclose under Rule 412 is a continuing one, requiring prompt notification to the defendant of the discovery of any additional material or information up to and during trial. Once the error occurred, the trial court should have had a hearing and didn't. Was the hearing requested? Yes, it was. A mistrial was requested. And a mistrial would have been the appropriate thing because you can't un-ring the bell at that point. Well, there is a case law that says that you can hold a motion to suppress in the course of a trial and decide the issue and then if necessary instruct the jury to disregard the testimony that was solicited that ends up being suppressed. But not even that happened in this case. Right. And the question is, whose burden is it to request such a relief? Are you saying to us that our choice is only a new trial, based on a mistrial request that should have been granted? Or is there a possibility, as there was in that one case, where the appellate court remands for an evidentiary hearing as to the independent basis for an identification that occurred at trial? I believe in this case that these are grounds for a new trial. Unlike People v. Lewis, which is the South Carolina case that the state cites, the biggest factors can be used to make a determination that it's unreliable. The facts are distinguishable. This case, in Lewis and many of the cases they cite, there is no even attempt at a pretrial identification. In this case, there's two pretrial identifications where there's no positive identification. Also, there's the intervening factor of the entire interaction that the state's attorney and the witness have in the courtroom. Even if Melissa's testimony was unreliable, and putting her aside, isn't the state's case made on the basis of Releisha's testimony, which did not have the impairments that you say that Melissa's identification had? Releisha was in a face-to-face with the alleged defendant. He took off his mask in her home. She testified that she had been to his niece's home, had been to the defendant's own residence and was a friend of his niece and knew him by his nickname. All it takes is one in terms of witness identification, direct, immediate, and isn't that sufficient for the state to make their case? Putting aside Melissa's testimony. We argued that the state did not sustain its burden, but even if you were to believe that that was sufficient, that they did sustain their burden, it was still a very closely balanced case. The jury deliberated for over 14 hours and they were deadlocked at one point. So the jury clearly did not view Releisha as a reliable witness and there was no other evidence that tied Donald Watkins to the scene. However this court chooses to categorize the error that occurred in this case, there was an error. Because that error was extremely prejudicial in this closely balanced case, Donald Watkins would ask this court to reverse his convictions and remand for a new trial. Or if this court finds that Donald Watkins was not proven guilty beyond a reasonable doubt, reverse his convictions for first-degree murder and home invasion. If this court has no further questions. Thank you, counsel. Do you have a short follow-up? Good morning, your honors. May it please the court. My name is Peter Fisher. I'm an assistant state's attorney on behalf of the people. I think before jumping into the legal issues, it's important to set the stage for what really was happening at this case. It's been repeatedly suggested and brought out that the little girl, Melissa, did not make an identification after the crime. But let's remember, she's a seven-year-old girl. She's asleep in a bed and she hears basically an explosion of a shotgun going off within feet of her. She was not able to identify him either outside of that traumatic scene. When a photo array was given to her and when the defendant appeared in person in an identification array. And why should we reach beyond that fact and consider the kinds of issues that you suggest we should consider? Her tender years, the fact that the events were clearly traumatic, that she was curled up in a fetal position. Why should we consider those issues, if at all? In other words, all that information that you put forth, which way does it cut? Does it cut in favor of an identification three years later? Or does it say that maybe to the extent that there was going to be a reliable identification it had to occur shortly after the crime or not at all? Show us how good you are at answering all three of our questions. Simultaneously. Certainly. And what I'm going to have to do is go back to what I was saying. And that is that this little girl, as in MM46, Detective Jacob says, that when she couldn't identify anybody she was withdrawn and in shock. I mean, this is within hours of seeing a man's head literally blown off. We use that expression sometimes, but. All right, then that raises the next question. Why not delay? Or why not delay the photo identification until she regains her head? Or why not delay the lineup identification until she has her full faculties available to her? Or in the event that everything is continuing as she experienced it at the time of the crime, why not do it all over again a month later, two months later? Why wait three years? Well, first of all, as a practical matter, we had the evidence of Berlicia, which she testified that she knew this person. She identified him. He did have the tattoo, ironically, that had the speedy nickname which she had given to the police. There was enough to indict this defendant at that point. We can't have a photo array after that point once he's indicted. We can't have a lineup unless they're going to agree to it, and that in and of itself raises other questions. So we're prohibited from doing some of those things. To some extent, that's an argument that says, thank goodness, because she's able to fully recover three years later and be able to make a good identification later on. And I question whether there's a single case out there where an identification of this sort has ever been found to be, and I assume you're going to an independent basis, and the question is whether there's any independent basis, or what is the independent basis that didn't exist within five hours, ten hours, I don't know how quickly the identification procedures occurred, but where is the independent basis that can be absent at that time when the photo array is displayed or when the lineup occurs and reappears three years later at trial? Well, first of all, she's not withdrawn in shock anymore. That's one of the main factors. Second of all, I think it's kind of a misconception to get into the whole Neal versus Biggers thing. There was no suggestive lineup. All those cases where you suppress an identification are following something suggestive by the state. The opposite occurred here. There was no suggestion by the state. There was a lack of an identification. All those cases come up in the context of some suggestive ID, some suggestive identification. And the reason I put the South Carolina Supreme Court case in there is to talk about the fact that when you have just purely an in-court identification, that those Neal versus Biggers factors don't apply. They have nothing to do with this issue. It's two separate things. They talk about wanting to have a hearing. On what basis? But did the South Carolina court rely on the independent basis for the identification of in-court, which obviously must exist? There must be an independent basis for an in-court identification to occur. It never came up. But will you concede that there must be an independent basis for an in-court identification to occur? Oh, absolutely. Yeah, so to the extent that they didn't discuss it but Judge Schreier discussed it and we discuss it here and the parties discuss it in their briefs, where is the independent basis? That's my question. The independent basis is her ability at the time of the crime to observe the defendant's face. He's in that room. He has the mask off. She has sufficient basis. And she's seen him before as well, so that bolsters the fact. You think that's the sort of matter that should be litigated in the course of a pretrial hearing to determine whether or not there's an independent basis? Because certainly the judge, Judge Schreier, felt that there should be such an examination, and that was really the prejudice to the extent that defendants suffered any, was the lack of opportunity to challenge in the course of a pretrial trial. Challenge what? Challenge an identification. They had that opportunity through cross-examination and argument, like the Seventh Circuit has said and like the Supreme Court of South Carolina and all those other cases said in it. That's your way to challenge it, not through a pretrial. Are you saying that either your office and presumably the state at that point knew that an identification in the course of the trial was going to occur? Is that your statement? No. Well, then, what about preparation? Do you think that the Supreme Court rule requires that your office disclose that an identification is likely to occur in the course of a trial? The rule doesn't say that. The rule doesn't say anything close to that. We quoted the rule at length in the brief. Talk about witnesses you intend to call, together with their relevant written or recorded statements, memorandum containing substantially verbatim reports if they're all statements, et cetera, et cetera. And possession and control, and to the extent that there is possession and control. Possession and control of what? Of the things listed in the rule. This isn't something listed in the rules. There's no catch-all that says, I know that the brief of the appellant is based on the notion that you're supposed to avoid surprise. And I agree that that's the general rule for it. Well, then let me ask you this question. And be as candid as you can. Are you saying that then it is okay for an assistant state's attorney to think, to infer, to reasonably conclude that this witness, who has not made an ID during the photo display or line of display, but can possibly make an in-court identification based on whatever course of preparation there's been, but never that question asked of that person, and that it's okay to do that? To, in fact, put the question to the witness, can you identify, in so many words, can you identify the person that was in the bedroom at the time the shot went off in this court without disclosing it in the discovery, pursuant to discovery? I don't think that happened here, but I think that would be okay. And, again, I don't think it happened here. Let's remember, there's nothing nefarious or wrong with putting a little girl on the stand the day before. This is standard procedure, and we do this all the time. The day before what? You didn't finish your sentence. We didn't finish the sentence. Putting her on the stand the day before in courtroom and saying, this is where you're going to sit. In preparation. The judge is going to sit here. The clerk is going to sit here. We do this. What about if Spanky is going to sit here? And she doesn't say, who's Spanky? What do you mean, Spanky? Was Spanky the person that was, what if she did ask, was Spanky the person that was in the bedroom with me at the time? Well, we don't have any evidence that that happened. All we have is the colloquy, which is admittedly somewhat difficult to follow at times, and the reason it's difficult to follow, and the reason that the state's attorney made the statement that he made in opening statements is this is a 10-year-old girl. And, in fact, I've done the same thing. You get a little girl, especially in a sex case, you don't know whether they're going to say anything at all. He may have been preparing for the fact that she'd get on the stand and say nothing. And we've all seen cases, and I've tried cases, where the little girl gets on the stand and freezes. That was an equally likely possibility in this case, especially looking at what happened when she was cross-examined at certain times in this case. She basically froze several times during the cross-examination. There's several points in the testimony where there's little parentheses that says inaudible or no response. She was freezing then. Let me ask you this about Judge Fryer's characterization of the identification as being spontaneous. Yeah. Do you think that was an accurate characterization? Was it spontaneous? Well, he says it was. I wasn't there, so we have to take him. Nobody was. None of us was there. And we're never there. And that's why we have the standard of review, and that's why we have to take the judge's factual findings, which that was, with discretion. If we were to reject that factual finding, would that be the start of the downhill slide? Well, I don't know how you can reject the factual finding of a judge saying that, in his opinion, it appeared to be a spontaneous response. I don't think there's anything in the law or the record that would allow you to do that. It's just not something that comes with the purview of being an appellate court justice, with all due respect. I don't think you can just say that the judge was wrong when he said it. And I don't mean to suggest that that's all we would do. No, I understand that. All right. Defense counsel mentions the fact that Melissa was the victim of a horrible crime and wants somebody to pay. There's no evidence of that. She doesn't even know Al's last name. She was a visitor in the house. She has no ax to grind here. Let me ask you this. Why did the state fail to disclose that it would ask Melissa to provide ID testimony? Why did they not disclose that? Well, first of all, I don't think you have to disclose that. I don't think that's something that the rule provides for. But we didn't know, apparently, based on this record, what this little girl was going to say. So there's nothing in the rule that says you have to ask, you have to tell them the questions you're going to ask and what might happen. You have to give over information that you have that exists already. You have to give over information about what experts are going to testify to. If you know the witness is going to say something different than what the witness has said before, you have to turn that over. Did you write a letter to this court that the state did not know what Melissa was going to say in response to that ID testimony prior to her being asked the question? I don't think they knew. Obviously, they knew there was a possibility she would say that. They obviously knew that. The question was, who did you see? And it was brought up earlier that that led to necessarily one answer. That's not necessarily true. She could have just as easily said, a man with a gun. She could have said nothing. She could have said, I saw Al and he didn't have a head. I could have said, I could have said all sorts of things. It doesn't necessarily mean, did you see the defendant here? Regarding the obligation to disclose, what about Judge Schreier's comment that the state should have taken the other, should have disclosed that information? It would have been better. He says it would have been better practiced. And to the extent that he said it would have been better practiced, do you think he was meaning that it falls within the rule? I'm not sure. I'm not sure. You could certainly argue that that's what he meant. And the crucial thing here, though, is that even if it were a discovery violation, what would have been different? Okay, we tell them ahead of time. We're going to ask this question. How would their cross have been any different? It's the same cross. The cross is, Melissa, you didn't say this to the police earlier. Melissa, you didn't identify him at the photo, right? Melissa, you didn't identify him at the lineup. The cross would have been the same. No new information was needed. They'll continue. What about the pretrial suppression hearing? Again, I Well, there's no suggestive I.D. suggested there. All right, but what about a motion to eliminate? What if the state had disclosed that she – it will be asked the question whether she can identify the individual, and the defense files a motion to eliminate seeking to bar such testimony based on the lack of identification during the photo display and during the lineup, and therefore – and contesting and asserting that there is no independent basis. Would the judge have it within his discretion to say, I want to have an independent basis hearing to decide whether or not to grant? I've never seen such a hearing held. I've never seen such a hearing held, and again, maybe there's one out there, but the – it's based on suggestive I.D.s is how they come up. If he'd asked for an independent basis hearing, she would have said I was in the room. She would have said what she said at trial, and then I do have a question regarding – that's connected to that, because the entire identification, I think, falls or stands on the point when the assailant takes off his mask. And that occurs after the shot is fired. Yes. And that – and after the shot is fired, my recollection, and maybe I'm wrong, but that the little girl goes under the covers to conceal herself or to hide or to, you know, gain that security that she gained by being in the fetal position, anything of that sort. And in fact, I'm not even sure where the assailant was and the adult witness was when the individual removed his mask. Were they in the bedroom? Is that the record? And if they weren't in the bedroom, how can we possibly determine when the little girl actually saw the face of the assailant other than when he had the mask on? I think there's two different things. There's two different incidents where the mask comes off. She says that she wakes up after a boom and then there's – and the guys – so we don't know if the boom is the back door being kicked in or the gunshot having been – she says she wakes up to a gunshot. Now, she also calls the thing that he's holding a gunshot. So that's kind of difficult. But there's a subsequent thing. So after the defendant goes in and shoots the victim, at which time he takes off his mask so she can see him, he also goes then into the living room. That's when he grabs mom. And then, remember, he brings mom back into the bedroom and shows her what he's done and says, you're going to be next. And then at some point his mask comes off at that point and she recognizes him as Speedy. And she knows him and she's seen him. She knows where he lives, the general area. She gives a description. He does, in fact, have a Speedy tattoo. So I think there's two different times where the mask was up or off or at least that his face was visible. I don't think it necessarily is the same time because he has to leave the room, go to the living room and bring the mother back into the room. So at that point the little girl is hiding under the covers or under the bed or she's cowering in fear, understandably so based on what's happened in this case. The other thing to remember is that counsel argues that this was a close case and that that's proved by the fact that the jury was out for 14 hours and was deadlocked. And, again, as in all these cases, we don't know why the jury was out. But we do know that it was a 6-6 initial vote or some vote. At one point it was 6-6. The record shows that. Well, if the record shows that the jury's out for an hour, does that mean we don't even get into it? No, the record shows that the jury note came in that the jury was deadlocked 6-6. Does the record show that? Yes, but we don't know why. We don't know what they were discussing. Well, we do know that 6-6 means 6 guilty, 6 not guilty. I mean, there is no other interpretation of that, is there? What I'm suggesting is if we go down that route for a basis of decision, I'm asking that if the record shows that they're out. You didn't answer the justice's question. The record shows that. I don't know what it means. I think it's very dangerous to get into anything, discuss, you know, what the jury's doing in the back room and putting a time element on it because, ultimately, as I was saying, if we find out they were out for half an hour, does that mean that we're not going to talk about this on appeal? No, no, but there is at least one case that I'm familiar with, and I'm sure you're familiar with it as well, the Supreme Court making the observation that when the jury is deadlocked, that's certainly a factor in favor of calling the case a close case. True? There is case law to that. Yeah, and I think that's a major mistake on the part of the court. Well, you could tell that to the Supreme Court, but until the Supreme Court determines differently, we're going to necessarily give it its due. I don't think that is a correct statement of the law, though. I don't think that was a ‑‑ I think it was a dicta statement that would be dangerous to rely on in proof. You have to look at the facts of the case to determine whether it's a close case, not what the jury was doing, not, you know, if it's 11 to 2 because there's two holdouts because they want to spend the night at the hotel. Let's go on that rule of thumb in your office. What's the rule of thumb when ‑‑ isn't it like four and a half hours or six hours of deliberation? Once you pass over six hours? The rule of thumb that I've heard is relating to the number of days of testimony versus the number of hours of deliberation. I think these rule of thumbs, I mean, there are cases where the jury wants to spend the night at a hotel, and so they, you know, they come back the next day. I mean, who knows what they're thinking half the time? You know, it could be 11 to 1. But, of course, juries send notes out, not because they're deep in the process of deliberating, but because they're looking for guidance or they're looking, they're at a point where they don't feel like they have the light at the end of the tunnel, and that's what happened here. Yeah, and they also signed a jury verdict, finding the defendant guilty beyond a reasonable doubt unanimously, and based on the evidence in that case. And that's always the case that, in every case that comes before us, isn't that true? I mean, every case that is in the short circuit. Absolutely. So all we know for sure is that they found him guilty beyond a reasonable doubt unanimously. The rest of it is speculation. And even a note coming out of speculation, could it just be, they could just be dealing with one person who's a holdout or doesn't understand. Are you saying that the judge, in the course of its response to that note, was responding to speculation? Come on. That's not a fair statement. No, the judge isn't responding to speculation. No, he's not. But speculating exactly what's going on in that room is dangerous for all of us, I would assert. Your Honors, for the reasons that we've stated in the briefs, and, again, I would state that we do not believe that there was a discovery violation that took place at all here. Even if there had been a discovery violation, the fact of the matter remains that nothing would have changed. The result would have been the same. There was an independent basis in this case, even though there was no pretrial suggestion. In fact, the opposite. Nothing the State's attorneys did in this case with regard to that witness was improper. This is the way all child witnesses are prepared for trial, and, in fact, usually they're brought in several times to court to go through their testimony. And the fact that we don't know what the witness is going to say is a very common occurrence when you're dealing with a child witness. You really don't know until that little girl or little boy gets on the stand what it is that they're going to say. With all those reasons, we'd ask that you affirm the defendant's conviction. Thank you, counsel. Brief rebuttal? Ms. Hart, I think Mr. Fisher put the question at the heart of this case to us, and I guess I'm putting it to you. What would be different? Well, what would have turned out differently if they had disclosed that information? The cross-examination, which was very thorough and cogent, would have likely been the same, no? I believe that there would have been a motion to bar identification at trial. Well, counsel says that the state of the law is that there is no basis for a Biggers-type motion absent a pretrial suggestive identification. Actually, the state cites a South Carolina Supreme Court case to make that assertion. There's two ways I want to respond to that question. The first is, the state said, and you just repeated, there was nothing suggestive by the state. Well, regardless of what may have gone on in the courtroom pretrial, and while understanding that it is normal to pretch, especially child witnesses in a courtroom, we know that as a result of whatever happened in the courtroom prior to trial, that the child, Melissa W., specifically said to the defense attorney, you're Spanky's attorney, you're sitting over there. And then at trial, she said, when asked, who did you see, she said, Spanky, and pointed to the defense table and to the defendant. That is very troubling, because we don't know that there's an independent origin for the ID. And the other thing that I would like to bring to your attention is the Illinois Supreme Court's case, where they say, we are only concerned with whether an independent origin exists to establish separate reliability for an in-court identification. And in this case, if they had held a hearing prior to trial, there would have been no separate basis. There was no independent origin for identification. So are you familiar with those types of hearings? Your opposing counsel didn't seem to have experienced one previously. You said that's a rare thing to have that type of hearing. It might be a rare thing, but in certain situations, they're necessary, especially in this case. Because of the particular circumstances surrounding this witness and this crime, there should have been a hearing. They would have determined that the ID was unreliable. There was no independent basis. And then Melissa would not have been able to identify, to be asked the question, can you identify the person you saw in that room? If this Court has no further questions. Thank you, counsel. Thank you. This matter will be taken under advisement. This Court is adjourned.